1
2
3
4
5
6        **UNITED STATES DISTRICT COURT**
7        **SOUTHERN DISTRICT OF CALIFORNIA**
8
9   RAUL LIZALDE, dba VEBS; and VEBS,        CASE NO. 10-CV-834-AJB (RBB)
    INC.,
10                                           ORDER DENYING DEFENDANTS'
                                Plaintiffs,  MOTIONS TO DISMISS SECOND
11         vs.                               AMENDED COMPLAINT
12  ADVANCED PLANNING SERVICES,
    INC; INDEPENDENT CAREER
13  AGENCY, INC.; JEFF ROEDIGER; et
    al.,
14                             Defendants.
15

16         Now before the Court are several motions to dismiss this copyright infringement and

17  breach of contract action.  The Court found the motions suitable for decision on the written

18  briefs.  Local Civil R. 7.1(d).  For the reasons stated below, the Court denies the motions to

19  dismiss the Second Amended Complaint ("SAC").

20                              **Background**

21         Plaintiffs Raul Lizalde and VEBS, Inc. ("Plaintiffs") filed a SAC against three

22  groups of Defendants.  When appropriate the Court refers to them collectively as

23  "Defendants," but at various points it is necessary to distinguish between the actors.  "ICA

24  Defendants" refers to the primary defendants – the corporate entity Independent Career

25  Agency, Inc., and its principal, Michael Rodman.  *See* SAC ¶¶ 25, 48, 51.  The Court uses

26  the term "APS Defendants" to refer to ICA's affiliate, Advanced Planning Services, Inc.,

27  and its two principals, Jeff and Lori Roediger.  *Id.*  The third group is the "Insurance Agent

28  Defendants" (or "Agents").  This group includes nine individuals (Beth Chalmers, Larry

                                    1

Chalmers, Charles Dzama, Miriam Feldman, Stan Friedman, Gus Gonzalez, Marilyn Miller, Robert Padilla, and Angela Parrish) and their companies (Chalmers Agency, Inc. and Premier Financial Solutions, LLC), who operate independent insurance firms throughout the United States.[1]  *Id.* ¶¶ 10-21, 26, 50.

Plaintiffs sell insurance products, including life insurance, annuities, and long-term care policies.  SAC ¶¶ 27-28.  Plaintiffs also have "an expert understanding of retirement programs for federal employees."  *Id.*  Plaintiffs combined these two interests by designing an educational program to inform federal employees about their options for retirement benefits and financial planning.  *Id.* ¶ 29.  Plaintiffs created, and registered copyrights, on a booklet and six power-point presentations.  *Id.* & Exs. B, F, G.  Plaintiffs refer to these materials as the "VEBS Program."  Plaintiffs contract with various federal agencies to present the information at workshops.  *Id.* ¶ 29.  After the presentation of the VEBS Program, Plaintiffs meet with individual employees and often sell them additional insurance products.  *Id.* ¶ 30.

### A.    Three Contracts

In July 2008, Plaintiffs met with the ICA and APS Defendants to discuss a marketing venture involving the Insurance Agent Defendants.  *Id.* ¶ 50.  Ultimately, there are three related contracts, though each actor played a different role in the endeavor and signed different contracts.  The parties agreed to share any commissions earned from sales generated by the VEBS Program.

#### 1.    Marketing Agreement

The first of the three contracts is the Marketing Agreement.  The Marketing Agreement established a direct contractual relationship between ICA Defendants and Plaintiffs.  ICA Defendants agreed to locate, train, and support other insurance agents to generate additional business for Plaintiffs' products and services.  SAC Ex. D.  Plaintiffs licensed the VEBS Program to ICA Defendants so that they, in turn, could distribute it to

---

[1]Jeff and Lori Roediger and Michael Rodman also signed Confidentiality Agreements, but in most instances, the SAC associates these individuals with their corporations, APS and ICA, respectively.  SAC ¶ 21 (defining "Agents").

2

1   independent insurance agents who would generate sales to other retiring federal employees.

2   *Id.* ¶ D.

3        By comparison, APS Defendants were involved in the discussions, but were *not*

4   signatories to the Marketing Agreement.  APS is an "insurance wholesaling firm" and a

5   "master general agent" with several insurance companies.  *Id.* ¶ 30.  APS had an existing

6   network of agents and companies who had their own insurance products to sell.

7        The final group, the Insurance Agent Defendants would pay an initial fee to be

8   trained on the VEBS Program, and a monthly fee to continue using Plaintiffs' copyrighted

9   materials in their own workshops to federal agencies.

10       With this structure in mind and following further discussion, Plaintiffs executed the

11   contract with ICA Defendants in October 2008.  SAC Ex. D.  Neither APS Defendants nor

12   the Insurance Agent Defendants signed the Marketing Agreement.

13       The Marketing Agreement designated Plaintiffs' copyrighted materials and other

14   documents as "Confidential Information" that must be protected.  *E.g., id.* ¶¶ B, C, 3-4, 11,

15   13-19.  Plaintiffs granted ICA Defendants the "exclusive license" to use the VEBS Program

16   and to license the Confidential Information to its agents "subject to the condition that ICA

17   enter into a Confidentiality Agreement with its Agents."  *Id.* ¶ 4; *id.* ¶ 11 ("ICA will not

18   permit the use of Confidential Information by persons or Agents that are not authorized . . .

19   and have not entered into a Confidentiality Agreement with ICA").  "ICA agrees not to

20   modify or create a derivative work of the Confidential Material without the prior consent of

21   VEBS."  *Id.* ¶ 12.  The Marketing Agreement imposed a duty on ICA "to protect VEBS

22   Confidential Information" and to use it "only in pursuance of its business relationship with

23   VEBS and its Agents."  *Id.* ¶ 14, 15 ("ICA will take all reasonable measures to avoid

24   disclosure, dissemination or unauthorized use"), 16.

25       The Marketing Agreement had a three-year term, but the contract could be

26   terminated upon thirty-days written notice.  "In the event that VEBS terminates this

27   Agreement, ICA shall have the right to continue to use the Confidential Information with

28   Agents already licensed by it and agrees to continue to pay VEBS override commissions."

*Id.* ¶ 6.  Upon termination, ICA agreed to provide a list of Agents with existing licenses, but promised to "no longer use the Confidential Information in regard to any additional Agents." *Id.*

The Marketing Agreement further provided that even if the parties terminated the contract, certain provisions governing confidentiality "expressly survive." *Id.* ¶ 22. Among the surviving provisions, ICA promised not to permit the use of Confidential Information by unauthorized agents and promised to split commissions and renewals generated under the Marketing Agreement. *Id.* ¶ 11, 13, 14.

In addition, the Marketing Agreement included an arbitration clause of "[a]ny dispute arising out of or related to this Agreement." *Id.* ¶ 31; *accord id.* ¶ 14.

## 2. <u>Confidentiality Agreements</u>

With the possible exception of Dzama and Beth Chalmers, each of the named Insurance Agent Defendants signed the required Confidentiality, Nondisclosure, and Ownership of Intellectual Property Agreement (hereinafter "Confidentiality Agreement") with Plaintiffs and ICA.[2]  SAC Exs. C-1 to C-10.  In addition, Rodman and Jeff and Lori Roediger signed a Confidentiality Agreement.  *Id.*

As the title suggests, this agreement protected Plaintiffs' confidential and copyrighted material.  It was drafted by ICA.  SAC ¶ 37.  The Confidentiality Agreement designated both Plaintiffs *and* ICA Defendants as the party "disclosing" the Confidential Information to each Agent, who was the "receiving" party of the VEBS Program.  It specified that "Receiving Party may use Confidential Information only in pursuance of its business relationship with the Disclosing Party."  SAC Ex. C-2 ¶ 2.  "Except as expressly provided in this Agreement, the Receiving Party will not disclose Confidential Information

---

[2]In their brief, Insurance Agent Defendants suggest that Dzama in fact signed a Confidentiality Agreement, but the contract cannot be found.  Pls.' Opp. Br. at 11; Padilla Reply Br. at 9 n.2.  This is beyond the four corners of the SAC, which generally alleges that Dzama knew about the Confidentiality Agreement. SAC ¶ 113. This unresolved fact question does not impact this motion.

Beth Chalmers did not sign a Confidentiality Agreement in her own name.  Plaintiffs' claims against her are based on an alter ego theory with respect to her family's business interests.  *Id.* ¶¶ 20, 26.

to anyone without the Disclosing Party's prior written consent." *Id.* "All Confidential Information will remain the exclusive property of the Disclosing Party." *Id.* ¶ 4. Moreover, the disclosure of the VEBS Program under the contract "will not constitute an express or implied grant to the Receiving Party of any rights to or under the Disclosing Party's parent [sic], copyrights, trade secrets, trademarks of [sic] other intellectual property rights." *Id.* Above the signature line, the Confidentiality Agreement emphasized in all capital letters that: "This agreement affects your rights to improvements and developments you make during your relationship with Disclosing Party, and restricts your right to use or disclose Disclosing Party's Confidential Information during or after the termination of your relationship with Disclosing Party." *Id.* at 2.

On the issues of scope and termination, the Confidentiality Agreement stated:

> This Agreement is intended to cover Confidential Information disclosed by Disclosing Party both prior and subsequent to the date hereof. This Agreement automatically will terminate upon the completion or termination of the parties' business relationship; provided, however, that Receiving Party's obligations with respect to Disclosing Party's Confidential Information will survive such termination.

*Id.* ¶ 7.

The Confidentiality Agreement contained the following forum selection clause: "Exclusive jurisdiction over and venue of any suit arising out of or relating to this Agreement will be in the state and federal courts of the County of San Diego, California." *Id.* ¶ 8.5.

### 3.   **Termination Agreement**

In early 2009, Plaintiffs complained that they were not receiving the monthly report or their share of the profits. SAC ¶ 54. Plaintiffs allege that Defendants Larry and Beth Chalmers and Parrish created a website using the VEBS Program. *Id.* ¶ 55. Plaintiffs also allege that in March 2009, ICA and APS Defendants initiated a plan to put Plaintiffs "out of the picture" and begin a partnership with a competitor. *Id.* ¶ 57.

On June 4, 2009, Plaintiffs sent a cease and desist letter to ICA and APS Defendants stating that they were terminating the Marketing Agreement for cause. *Id.* ¶ 56.

In October 2009, Plaintiffs and ICA Defendants signed an Agreement to Terminate

Marketing Agreement (hereinafter "Termination Agreement"), with a retroactive effective date of June 4, 2009.  SAC Ex. E.  The parties attached the Marketing Agreement as an exhibit, and the Termination Agreement uses terms and definitions from the Marketing Agreement.  *E.g.*, *id.* at 1, ¶¶ B, O.  "The parties intend that this Termination shall constitute a full and complete resolution of all their rights, duties and disputes concerning the subject matter of the Marketing Agreement."  *Id.* ¶ O.

Although APS had not signed the Marketing Agreement, it did sign the Termination Agreement as to form in order to acknowledge "awareness of, and its consent to" the terms. *Id.* at 1 ("Advanced Planning Services, Inc. was not a party to the Marketing Agreement, and it is thus not a party to this Termination.  Nonetheless, the Parties desire that Advanced Planning Services, Inc. acknowledge its awareness of, and its consent to this Termination, and Advanced Planning Services, Inc. is willing to do so in the interest of helping to facilitate this Termination between the Parties."); *id.* at 5 (Rodman signs on behalf of APS to acknowledge and consent to Termination Agreement).

The Termination Agreement required ICA to return, or certify it had destroyed, Plaintiffs' confidential or proprietary materials.  *Id.* ¶ E.  In order for that promise to reach the independent insurance agents who had already received the VEBS Program, ICA promised to "employ diligent efforts" to notify them of the Termination Agreement and that they could not make "future use" of the copyrighted materials.  *Id.* ¶ I.

As long as the business generated through the Marketing Agreement had been entered into prior to June 4, 2009, the existing profit sharing agreement applied and ICA had a duty to report those commissions.  *Id.* ¶¶ B, C, D.

The Termination Agreement provided for jurisdiction in the Superior Court of San Diego.  *Id.* ¶ K.  The forum selection clause applied to any dispute over the Termination Agreement as well as the Marketing Agreement that had been terminated.  *Id.*

Finally, the contract contained a mutual release.  "Except for the respective duties, rights and performances expressly set forth . . .  VEBS . . . hereby releases ICA, together with ICA's successors, assigns, affiliated entities (including but not limted to Advanced

Planning Services, Inc.), employees, agents, partners, and members, from all [sic] any and all claims, rights or causes of action, known or unknown, arising from, or in any way connected with the Marketing Agreement or this Termination." *Id.* ¶ L.  ICA gave Plaintiffs the same release. *Id.*

## B.   Litigation

In the instant lawsuit, Plaintiffs allege that the Insurance Agent Defendants engaged in post-Termination Agreement conduct that is imputed to ICA and APS Defendants.  SAC ¶¶ 66, 73-84.  For example, in October 2009, Defendant Padilla allegedly presented the VEBS Program to employees at the Internal Revenue Service. *Id.* ¶ 67.  Padilla allegedly created a derivative power-point presentation that was substantially similar to the VEBS Program, and ICA Defendants sold it to other agents. *Id.* ¶¶ 69-71.

Plaintiffs First Amended Complaint ("FAC") was dismissed as to certain counts with leave to amend.  Their SAC narrowed the legal theories to nine claims based on intellectual property and contract rights.  Defendants challenge the Plaintiffs' right to file this action in federal court, and argue that the claims for copyright infringement, misappropriation of trade secrets, palming off, and breach of contract fail to state plausible claims for relief.  Finally, Defendant Beth Chalmers moves for dismissal based on the failure to allege any specific misconduct on her part.

## Discussion

## I.   Jurisdication and Venue Issues

Defendants raise two theories as to why this Court lacks the power to hear Plaintiffs' case.[3]

### A.   Arbitration Clause in Marketing Agreement

Defendants argue the Court must dismiss the case because the Marketing Agreement contains a mandatory arbitration clause.  SAC Ex. D ¶ 31.

---

[3]The Court rejects Defendants argument that Judge Burn's March 25, 2011 Order on the FAC resolved the merits of the venue arguments and that Plaintiffs should have filed a motion to reconsider that decision.  Plaintiffs correctly observe that Judge Burns did not make a venue decision on the merits and that the FAC was dismissed without prejudice and with leave to amend.  [Doc. No. 79]

The Court rejects this argument because the parties to the Marketing Agreement terminated that contract by subsequently entering into the Termination Agreement.  SAC Ex. E ("Certain disputes have arisen between the Parties with respect to interpretation and performance of the terms and provisions of the Marketing Agreement, such that the Parties now elect to terminate the Marketing Agreement; and they now effectuate such election by entering and executing this Termination.").  The arbitration clause in the Marketing Agreement no longer controls the proper forum because the contractual terms have been superceded by the Termination Agreement.  The Termination Agreement contains its own venue clause.  It does not require arbitration.  SAC Ex. E ¶ K.

**B.**     **Venue Specified in Termination and Confidential Agreements**

Defendants move to dismiss the action for improper venue based upon a clause in the Termination Agreement that specifies the Superior Court of San Diego County as the mandatory forum.

Forum selection clauses are presumed valid, unless clearly shown to be unreasonable.  *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*, 915 F.2d 1351, 1353 (9th Cir. 1990) (citation omitted); *see* Fed. R. Civ. P. 12(b)(3); *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 324 (9th Cir. 1996) (court does not accept pleadings as true and may consider affidavits and other evidence outside the complaint when ruling on venue motion).

The Termination Agreement states that "jurisdiction over any dispute involving this Termination or the Marketing Agreement and their respective provisions shall be in the Superior Court of California, with venue [in the] County of San Diego."  SAC Ex. E ¶ K.

This express provision binds the parties who signed the contract – Plaintiffs and ICA Defendants.  In addition, APS Defendants expressly acknowledged and consented to the Termination Agreement – even though APS had not signed the prior Marketing Agreement and was not a "party" to either contract.  *Id.* at 5.  On its face, the Termination Agreement supports the ICA and APS Defendants' argument that Plaintiffs filed this lawsuit in the wrong court.

The Insurance Agent Defendants have a fair argument that they too are entitled to rely on the forum selection clause in the Termination Agreement despite the fact that they did not sign that contract. Parties that are sufficiently "related" to a contract can enforce the forum selection clause. *TAAG*, 915 F.2d at 1354 (citations omitted); *accord Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209-10 & n.7 (7th Cir. 1993). Here, the Insurance Agent Defendants are indirect beneficiaries of the Termination Agreement because their alleged misconduct is closely related to the Plaintiffs' contractual relationship with the other Defendants. Also, they signed Confidential Agreements that expressly acknowledged that the Agents' rights would end when ICA and Plaintiffs terminated their business relationship.

On the other hand, the Insurance Agent Defendants have a direct contractual relationship with Plaintiffs and ICA Defendants because they each signed a Confidentiality Agreement. The Confidentiality Agreement has its own venue clause and it specifies "federal or state court" in San Diego County.[4] Notably, ICA Defendants are also bound by the venue clause in that contract because they share the title of "Disclosing Party" along with Plaintiffs.

The Insurance Agent Defendants, however, argue that the Confidentiality Agreement does not control. They rely on a provision in the contract that states the Confidentiality Agreement "automatically will terminate" when the parties terminate their business relationship. SAC Ex. C-2 ¶ 7. The Court concludes that this argument fails because the rest of that clause states that the Insurance Agents' "obligations with respect to Disclosing Party's Confidential Information will survive such termination." *Id.*

To summarize, ICA Defendants have a solid basis to assert their contractual right to be sued in Superior Court, and APS Defendants have a colorable claim that they too can enforce the Termination Agreement's selection of state court. By contrast, the Confidentiality Agreement gives the Plaintiffs the right to select this federal forum to sue

---

[4]The Court finds no merit in Defendants' argument that the use of the word "county" means that venue is limited to State courts. The contract specifies either federal or state courts in San Diego County.

the Insurance Agent Defendants, even though Plaintiffs could have chosen to sue them in Superior Court along with the ICA and APS Defendants.

"[F]orum selection clauses are *prima facie* valid and should not be set aside unless the party challenging one can 'clearly show that enforcement would be unreasonable and unjust . . . .'" *TAAG*, 915 F.2d at 1353 (quoting *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 15 (1972)). Plaintiffs bear the heavy burden of proving the forum selection clause should not be enforced. *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1140 (9th Cir. 2004).

Plaintiffs explain that they did not bring the action against all Defendants in state court because they allege a copyright infringement claim. Federal courts have exclusive jurisdiction over copyright claims. 28 U.S.C. § 1338; *Scholastic Entm't, Inc. v. Fox Entm't Grp., Inc.*, 336 F.3d 982, 985-86 (9th Cir. 2003). Plaintiffs argue it would be unreasonable to require them to bring parallel lawsuits in both federal and state court on the same set of facts. Plaintiffs therefore ask the Court to find that enforcement of the forum selection clause in the Termination Agreement is unreasonable.

The Court agrees with Plaintiffs for several reasons. First, Plaintiffs can only bring their copyright claim in federal court. *See Full-Sight Contact Lens Corp. v. Soft Lenses, Inc.*, 466 F. Supp. 71, 73 (S.D.N.Y. 1978) (one factor in overriding a venue selection clause is the "availability of remedies in the chosen forum"); *Gaskin v. Stumm Handel GmbH*, 390 F. Supp. 361, 365 (S.D.N.Y. 1975) (forum can be unreasonable based upon the equities in particular case). While the state court has a strong interest in adjudicating claims based upon state law, it is well-settled that the federal court has jurisdiction over pendant state law claims. *Aldinger v. Howard*, 513 F.2d 1257, 1261 (9th Cir. 1975) ("The litigation of these intimately elated claims in a single forum makes good practical sense.") (citation omitted), *aff'd* 427 U.S. 1 (1976). On balance, comity is best served by allowing Plaintiffs to litigate their entire dispute in federal court.

Second, enforcing the clause in the Termination Agreement would require Plaintiffs to file duplicate lawsuits on the same facts in two different forums. That result would

waste judicial resources and impose unnecessary burdens on the parties, attorneys, and witnesses.

Third, in a typical dispute about venue, the convenience of the parties and witnesses is an important factor. *E.g.*, *Full-Sight*, 466 F. Supp. at 73. That factor is not present in this case because the Termination Agreement and Confidentiality Agreement both specified that lawsuits must be filed San Diego county. In San Diego, the Superior Court is across the street from the District Court. *See Secs. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309, 1313 (9th Cir. 1985) ("venue, which relates to the place where judicial authority may be exercised, is intended for the *convenience* of the litigants") (citations omitted).

Finally, the SAC alleges that counsel for ICA Defendants drafted the Confidentiality Agreement that contained the broader venue selection clause. As they were amenable to either federal or state court, as long as the case were tried in San Diego, their current complaint being haled into court in the Southern District of California carries little weight. *See Hoover Grp., Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1410 (Fed. Cir. 1996) ("Venue requirements exist for the benefit of defendants."); *Full-Sight*, 466 F. Supp. at 74 (discounting complaints of inconvenience by parties who entered contract with forum selection clause).

Accordingly, the Court denies Defendants' motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(3).

## II.   **Merits of Claims**

A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 338 (9th Cir. 1996).

The Court can consider the contracts that were incorporated into the complaint without converting the motion into a summary judgment hearing. *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003). This rule applies to documents that form the basis of a plaintiff's case or documents that are quoted extensively on the theory that such

documents are not truly "outside" the complaint. *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994).  Here, these include the Marketing Agreement, Termination Agreement, and Confidential Agreements.  SAC Exs. C-1 to 10, D, E.

A Court may also consider adjudicative facts that are subject to judicial notice. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); Fed. R. Evid. 201 ("A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").  This rule applies to Plaintiffs' copyright registration forms and the Bankruptcy Court's order lifting the stay as to Larry and Beth Chalmers.  SAC Exs. A, B.

### A.   <u>Release</u>

Defendants Jeff and Lori Roediger move to dismiss all claims based upon the broad release provision in the Termination Agreement.  Defendants Gonzalez and Miller join this motion.

This argument fails, as Defendants acknowledge in their opening brief and by not raising it in their reply brief, because the SAC alleges conduct that occurred *after* the effective date of the Termination Agreement.  A release of claims based on *future unknown* conduct is unenforceable as a matter of law in California.  *FASA Corp. v. Playmates Toys, Inc.*, 892 F. Supp. 1061, 1066-68 (N.D. Ill. 1995) (applying California law and holding "a purported waiver of future, unknown federal intellectual property rights is unenforceable and void as against public policy" because it would allow defendants to "violate another's intellectual property rights with impunity in contravention of the clear and long standing public policies underlying the trademark, copyright and patent laws"); *see Orsini v. Seabrooke*, 247 F.3d 953, 965 (9th Cir. 2001); *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1457-60 & nn. 5 & 7 (9th Cir. 1986) (the effect of a release of state law claims is governed by the law of the forum state).

In addition, the SAC does not allege that the Insurance Agent Defendants violated the Termination Agreement.  The Insurance Agent Defendants did not sign the Termination Agreement.  Instead, the SAC sues the Insurance Agent Defendants for violating the

contract that they did sign – the Confidentiality Agreement.  SAC ¶ 104-109 (breach of contract claim against parties who signed Confidentiality Agreement); *compare* SAC Ex. E *with* SAC Ex. C-2.  The Confidentiality Agreement does not include a release.  As Plaintiffs note, the Confidentiality Agreement expressly bound the Insurance Agent Defendants to a continuing duty to protect the VEBS Program in the future.  *Cf. Winet v. Price*, 6 Cal. Rptr. 2d. 554, 558-59 (Cal. App. 1992) (enforcing release of "unknown" contract claims).  Thus, the parties contemplated that the Insurance Agent Defendants could be liable for *future* breaches of the Confidentiality Agreements, even after Plaintiffs ended the marketing arrangement with ICA and APS Defendants.  SAC Ex. C-2 ¶ 2 (agents can use VEBS Program "only in pursuance of business relationship with" Plaintiffs), ¶ 3 (Plaintiffs own all intellectual property), ¶ 7 (obligations survive termination of marketing agreement), & p.2 (advising agents that contract impacts their rights "during or after" termination of business relationship with Plaintiffs).

### B. Copyright Infringement

Plaintiffs allege that all Defendants violated the copyrights on the VEBS Program – *after* the effective date of the Termination Agreement – by printing and using the materials and by creating derivative works.  SAC ¶¶ 87, 68-71 (Defendant Padilla), 73(d) (ICA and APS Defendants), 78 (Miller), 80 (Gonzalez), 81 (Friedman and Feldman), 82-84 (Chalmers Defendants and Parrish).  Plaintiffs allege that none of the contracts granted a right to create derivative works.  *Id.* ¶ 88.

All Defendants challenge whether Plaintiffs have stated a claim for relief under the federal Copyright Act.[5]  "To prevail on its claim of copyright infringement, [Plaintiff] must prove (1) ownership of copyright . . . , and (2) 'copying' of protectible expression by [Defendant] beyond the scope of [the] license."  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989).

---

[5]The Court rejects Defendants' contention that the heightened pleading requirements for fraud claims applies.  Fed. R. Civ. P. 9.  Plaintiffs' copyright cause of action is governed by, and meets, the fair notice standard in Rule 8.  Nor is the Court persuaded by the other arguments about the adequacy and specificity of the SAC.

### 1. **Valid Copyright**

ICA and APS Defendants, joined by several Insurance Agents, argue that the SAC fails to adequately allege that the VEBS materials were "copyrightable." These Defendants argue the VEBS Program is more like a process or system than a "writing." They rely on the description in the SAC that Plaintiffs "designed and created a database of common questions from federal employees about retirement benefits and financial planning." SAC ¶ 29.

The Court rejects this argument at the pleading stage. "A certificate of registration made within five years of first publication is prima facie evidence of the validity of the copyright. 17 U.S.C. § 410(c)." *S.O.S.*, 886 F.2d at 1085-86 (case citations omitted). This presumption also applies to the copyrightability of a work. Nimmer on Copyright § 12.11[B][3] (2012). Plaintiffs attached to the SAC the certificates of registration on each work, including the power-point presentations. SAC Ex. B. The SAC further describes the information that Plaintiffs added to create the booklet and presentations. SAC ¶ 29 (alleging "Lizalde designed and developed" materials tailored to each agency "with specific and targeted information with respect to the unique needs of the employees and programs available"). The Defendants' argument is more appropriately made on summary judgment where they will have the burden of rebutting the presumption. *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F.2d 1104, 1106-07 (9th Cir. 1990); *S.O.S.*, 886 F.2d at 1085-86 (citation omitted).

### 2. **License Under the Confidentiality Agreement**

Insurance Agent Defendants (except Dzama, but including Rodman and the Rodiegers) first argue that they were acting pursuant to a license and therefore cannot be held liable under the Copyright Act. In particular, they contend they have a non-exclusive, perpetual license to use the VEBS materials under the terms of the Confidentiality Agreement. Because the Confidentiality Agreement has never been terminated, the Insurance Agent Defendants argue that they have been acting, at all times, under the

license.[6]  *Effects Assoc., Inc. v. Cohen*, 817 F.2d 72, 74 (9th Cir. 1987) (owner of copyright gives up right to sue its own licensee for copyright infringement).  They argue the Confidentiality Agreement does not forbid them from creating derivative works.  In any event, the Agents contend they made the materials in furtherance of the "business relationship" as allowed by the contract.  The Confidentiality Agreement defines the "Disclosing Party" as including ICA Defendants (as well as Plaintiffs).  The Insurance Agent Defendants have not ended their business relationship with ICA Defendants, therefore, the infringement claim fails as a matter of law.

The Court rejects this argument at this stage of the case.[7]  *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658 (9th Cir. 1998) (denying motion to dismiss contract claim).  The Court must accept as true the allegations of fact in the SAC and construe all inferences in favor of Plaintiffs.  *Cahill*, 80 F.3d at 338.  The SAC alleges that Defendants infringed the copyrights for "their own unauthorized use in a competing business venture."  SAC ¶ 87.  "These actions, which occurred subsequent to the Termination Agreement, were performed without permission, license, or consent of VEBS."  *Id.*  These allegations state a cause of action for copyright infringement because they describe conduct beyond the scope of the license agreement.

On its face, the Confidentiality Agreement supports this part of the Plaintiffs'

---

[6]By contrast, the Roediger Defendants argue in their separate motion to dismiss for improper venue that the Confidentiality Agreement terminated *before* Plaintiffs filed this lawsuit.  [Doc. No. 90-1 at 5-6] They rely on the language in "scope/termination" section of the Confidentiality Agreement.  As discussed, the Court accepts Plaintiffs' reasonable interpretation of this provision.  The contract distinguishes between (1) the right to use the VEBS Program, which was allegedly revoked on June 4, 2009 by the Termination Agreement, and (2) the duty to maintain confidentiality, which survived the end of the joint business venture.

[7]Defendants are free to renew these arguments in summary judgment motions if the facts developed in discovery support their legal theories.  This Order examines the contracts only to the extent necessary to test the sufficiency of the allegations in the complaint.  The Court does not at this time definitively interpret the contracts or identify any ambiguities that might be require the introduction of extrinsic evidence.  *Davis v. Chase Bank U.S.A.*, 650 F. Supp. 2d 1073, 1088 (C.D. Cal. 2009) (finding plaintiff stated claim for breach of contract sufficient to survive motion to dismiss and declining to perform a contract interpretation analysis that would determine if defendant's proposed interpretation of the contract is the proper one); *MultiMedia Patent Trust v. Microsoft Corp.*, 525 F. Supp. 2d 1200, 1216-17 (S.D. Cal. 2007).

proposed interpretation of the terms.[8]  *Cf. Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (In a Rule 12(b)(6) motion, the court "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint.").  The contract emphasizes that Plaintiffs own the copyrighted material; that the Confidentiality Agreement does not constitute an express or implied grant of rights to or under the copyrights; and that the Insurance Agents are permitted to use the material only in the joint venture with Plaintiffs and ICA Defendants.  It also allowed Plaintiffs to terminate the license "upon the completion or termination of the parties' business relationship; provided, however, that Receiving Party's obligations with respect to Disclosing Party's Confidential Information will survive such termination."  SAC Ex. C-2 ¶ 7.

While the contract is not a model of clarity on the definition of the "parties," Plaintiffs articulate a reasonable interpretation based upon the use of the term in the Confidentiality Agreement as a whole.  *S.O.S.*, 886 F.2d at 1086 ("The license must be construed in accordance with the purposes underlying federal copyright law.").  Plaintiffs allege that the Confidentiality Agreement ended, in terms of the Insurance Agent Defendants' right to continue using the VEBS Program, when Plaintiffs ended the arrangement with ICA Defendants.  A fair reading of the entire contract indicates that the Confidentiality Agreement is structured to tie the Agents' license to *Plaintiffs'* continued work with ICA Defendants to market the VEBS Program.

The interpretation offered by the Agents does not make sense.  ICA Defendants had an existing business relationship with the Insurance Agent Defendants.  The Agents'

---

[8]The Insurance Agent Defendants argue that the Confidentiality Agreement itself granted them an implied, nonexclusive license.  *Foad Consulting Grp. v. Musil Govan Azzalino*, 270 F.3d 821, 825-26 & n.7 (9th Cir. 2008).  Even if the contract does not contain explicit language, they maintain that the Confidentiality Agreement created a license by granting them the right to "use" the VEBS Program.

Plaintiffs dispute this contention.  They argue that the Confidentiality Agreement did not license the Agents to replicate the VEBS Program; no such right is created in that contract; and only ICA had an official license through the Marketing Agreement.

This dispute may create an ambiguity in the contract, but such a dispute cannot be resolved in a motion to dismiss.  *Id.* (summary judgment motion used to resolve whether contract created an implied, nonexclusive license in copyrighted work); *Wyler*, 135 F.3d 658.

interpretation turns the Confidentiality Agreement on its head because it would allow the licensees to decide when to stop using the Plaintiffs' intellectual property.

At this stage of the case, the Court accepts Plaintiffs' colorable argument that the Confidentiality Agreement bound the Insurance Agents to respect Plaintiffs' copyrights once Plaintiffs ended the marketing venture with ICA Defendants directly, and thus, indirectly ended it with the Agents.

As Plaintiffs own the copyrights, the contract must be construed to protect the copyright; thus, the Agents' argument is unavailing that the Confidentiality Agreement allowed them to create derivative works. The contract restricts the use of the copyrighted material by the  Insurance Agent Defendants.  Silence does not constitute permission because "copyright licenses are assumed to prohibit any use not authorized." *Id.*

### 3.    <u>Unilateral Termination of an Irrevocable License</u>

The Insurance Agent Defendants further argue that the Confidentiality Agreement did not set a specific termination date and that "[t]he license could theoretically go on forever so long as the 'parties' continued their business relationship."[9]  Padilla Mot. at 7. Under Ninth Circuit case law, they argue Plaintiffs cannot unilaterally terminate the license for a minimum period of thirty-five years. *Rano v. Sipo Press, Inc.*, 987 F.2d 580, 585 (9th Cir. 1993).[10]  In *Rano*, the Court interpreted § 203 of the Copyright Act to preclude termination at will *unless* the license specified an earlier termination date. *Rano* held that this provision of the statute preempted any contradictory rule of California contract law. *Id.*  The Confidentiality Agreement is supported by consideration. SAC Ex. C-2 (stating receipt of "good and valuable consideration").  Plaintiffs concede the Confidentiality Agreement has not been terminated and is still a valid contract. SAC ¶¶ 49, 59, 105.

---

[9]For the reasons stated above, the Court does not credit the Insurance Agent Defendants' proposed interpretation of the term "parties" in the Confidentiality Agreement to allow them to continue to use the VEBS Program while they work with ICA Defendants even though Plaintiffs ended the marketing venture.

[10]*Rano* has been criticized and rejected by other Circuits as inconsistent with the statute.  *Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1295 (11th Cir. 1999); *Walthal v. Rusk*, 172 F.3d 481, 483 (7th Cir. 1999).

The Court finds that *Rano* is distinguishable from the facts alleged in the SAC. *Wyler*, 135 F.3d 658; *Cahill*, 80 F.3d at 338.  In *Rano*, the license did not specify a termination date and the licensor argued he revoked the license simply by filing the copyright infringement action.  *Rano* acknowledged that the law permits the licensor to terminate the agreement when the licensee materially breaches the contract.  987 F.2d at 586.  In support of this exception, the Ninth Circuit cited *Costello Pub. Co. v. Rotelle*, 670 F.2d 1035, 1045 (D.C. Cir. 1981), which held that "an action for copyright infringement would lie if the breach [of the license agreement] is so material that it allows the grantor power to recapture the rights granted so that any further use of the work was without authority."  The allegations in the SAC satisfy that standard.  Plaintiffs allege that a license was granted in 2008, but that the licensees materially breached the agreement in 2009 by failing to pay commissions on the sales.  After sending a cease and desist letter, Plaintiffs reduced to writing the termination of the license.  The SAC alleges that Defendants thereafter infringed the copyrights by using them in a competing business venture without compensating Plaintiffs.  This factual pattern, if proven, falls within the exception identified in the *Rano* decision and the rule stated in the *Costello* case.

### 4.       Marketing and Termination Agreements

Although the Insurance Agent Defendants were not parties to the Marketing Agreement or the Termination Agreement, they argue that these contracts defeat Plaintiffs' copyright infringement cause of action.  The Court assumes for purposes of this motion that the Insurance Agent Defendants are entitled to rely on and to enforce these other contracts.

These Defendants argue that the Marketing Agreement operated to grant them a license and Plaintiffs cannot claim infringement when there was a valid license in place. They first rely on the passage that states "VEBS agrees to provide ICA *and its Agents* access to the Program" for marketing to federal employees.  SAC Ex. D, ¶ D (emphasis added); *id.* ¶ 4 ("VEBS grants ICA the right to license the Confidential Information to its Agents").  As above, they argue the Marketing Agreement was irrevocable at will because it was for an unspecified duration and the Agents never consented to terminate the license.

The Insurance Agent Defendants assert that they did not commit a material breach at the time Plaintiffs attempted to revoke the licenses in the Termination Agreement; therefore, the facts do not fall within the *Rano*/*Costello* cases.

The contract does not support their argument. The Marketing Agreement had a three year term. SAC Ex. D ¶ 5. The Ninth Circuit recognizes that its decision in *Rano* does not apply to contracts that specify the duration of the license. *Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1044-45 n.8 (9th Cir. 2005) ("*Rano*'s narrow facts have no application here, where the 1930 grant expressly provided for its duration"); *Scholastic*, 336 F.3d at 988 ("because the contract at issue is of a definite duration, neither Section 203, nor any other provision of the Copyright Act, governs Scholastic's right to terminate or rescind the license"); *Rano*, 987 F.2d at 585 (35-year statutory period applies "unless they explicitly specify an earlier termination date").

Moreover, the Marketing Agreement was terminated, in writing, in the Termination Agreement. The Court is thus persuaded that at least from a pleading standpoint the SAC survives dismissal.

The Insurance Agent Defendants further argue that ¶ 6 of the Marketing Agreement allows them to continue using the Confidential Information into the future. That paragraph states:

> *In the event* that VEBS terminates this [Marketing] Agreement, ICA *shall have the right to continue to use the Confidential Information with Agents already licensed by it* and agrees to continue to pay VEBS override commissions, as referred to in paragraph 8 below. *Upon termination* by VEBS, ICA will produce a list of Agents licensed by it to promote the Program and covenants and agrees that upon termination of the Agreement, *ICA will no longer use the Confidential Information in regard to any additional Agents* and agrees to return all Confidential Information, not necessary to maintain its contractual relations with *authorized Agents*.

SAC Ex. D, ¶ 6 (emphasis added). The Insurance Agent Defendants argue this passage unequivocally states that ICA and its Agents "shall have the right to continue to use" the VEBS Program. The Marketing Agreement also identifies this paragraph as one of the provisions that "expressly survives the termination of this Agreement." *Id.* Ex. D, ¶ 22.

The Court is not persuaded that this argument entitles Defendants to dismissal of the

copyright claim at the pleading stage.  As noted above, the SAC alleges that the Termination Agreement superceded this paragraph of the Marketing Agreement.  Plaintiffs thus allege that the Marketing Agreement no longer controls the use of the VEBS Program.

As to the Termination Agreement, the Insurance Agent Defendants argue that Plaintiffs cannot rely on it to impact the rights of the Agents' under the Confidentiality Agreement.[11]  The Termination Agreement does not mention the Confidentiality Agreement or purport to terminate the Agents' licenses.

This argument is not supported by the language in the contracts.  The Confidentiality Agreement notified the Insurance Agent Defendants that the agreement to use the Confidential Information would end upon "termination of the parties' business relationship."  SAC Ex. C-2, ¶ 7.  The Termination Agreement also expressly purports to terminate the rights of the Agents to continue using the copyrighted materials.  SAC Ex. E, ¶ I(b) (stating that VEBS "has terminated authorization for the Agents to use the VEBS Program" and that future use is "prohibited").  Plaintiffs offer a reasonable interpretation that distinguishes between the right to use the VEBS Program and the duty to keep the material confidential.  Plaintiffs contend that when the Termination Agreement ended the marketing arrangement, the Agents were no longer entitled to use the VEBS Program, but the Confidentiality Agreement continued to impose an obligation to maintain the confidentiality of Plaintiffs' Confidential Information.

**B.    Misappropriation of Trade Secrets**

Plaintiffs allege all Defendants misappropriated trade secrets.  Plaintiffs designated a list of Confidential Information in Schedule 1 of the Marketing Agreement.  SAC ¶ 112 &

---

[11]The Insurance Agent Defendants raise an interesting point concerning the effective date of the Termination Agreement, which is backdated to June 4, 2009, though ICA Defendants and Plaintiffs did not execute the contract until the end of October 2009.  The Termination Agreement did not require ICA to notify the Agents of the termination until the contract was "fully executed."  The Insurance Agent Defendants complain that they should not be held to have infringed a copyright during the time they thought they had a valid license because a contrary ruling would allow Plaintiffs "to play a game of 'gottcha.'"  Padilla Reply Br. at 6.  This argument, assuming it has merit, is not relevant to the instant motion to dismiss the copyright claim.  Innocent infringement of a copyright is not an affirmative defense to an infringement action.  Nimmer on Copyright § 13.08 (2012).  At most, the Insurance Agent Defendants would be entitled to some relief as to the amount of statutory damages.  *Id.*

Ex. D, Sch. 1; *accord id.* Ex. C-2 (Confidentiality Agreement defines Confidential Information as any material or information so marked).  Schedule 1 lists nineteen items, including the VEBS booklet and power-point presentations that were copyrighted as well as the logo, letterhead, FAQs, a response card, reports, a video, and packets.  *Id.* Ex. D, Sch. 1.  The SAC alleges that "Defendants knowingly acquired the trade secrets by improper means and they improperly disclosed them to third parties."  *Id.* ¶ 114.  Plaintiffs specify that these actions "occurred subsequent to the Termination Agreement."  *Id.*

The Insurance Agent Defendants (including the Roedigers) argue the SAC fails to state a claim for misappropriation of trade secrets because the VEBS Program was regularly presented to the public at workshops.  California law defines a trade secret as information that:  "(1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).  These Defendants argue the alleged materials fall outside that definition as a matter of law because they were not secret.  In particular, they argue that any secrecy was lost when Plaintiffs presented the information with its applications for copyrights and attached them to the SAC on the public docket.  The Insurance Agent Defendants also challenge the inclusion of such of items as the logo on Plaintiffs' letterhead and business cards.  They rely on the following language in Judge Burns' order dismissing the FAC:  "Because [the VEBS Program materials] are publicly presented and shared with audiences, they are obviously not confidential, and no factual allegations show why these would be trade secrets."  [Doc. No. 79 at 15-16]  Judge Burns found the FAC too vague, but granted Plaintiffs leave to amend to cure the deficiencies.

Plaintiffs concede that Schedule 1 is over-inclusive and that the logo, letterhead, and business cards are not trade secrets.  Plaintiffs do not mention the power-points, but they do argue that the "Agent Guide Booklet" is a trade secret and that it alone supports the misappropriation cause of action.  Plaintiffs state that the booklet is not distributed to

federal employees; rather, it is roadmap of how to market and implement the VEBS business model.  Further, Plaintiffs contend there is no controlling authority to presume that a document is not a secret when attached to an application for a copyright, but in any event, that would be an affirmative defense.

The Court denies the motion to dismiss the cause of action because Plaintiffs have identified at least one item that is arguably a trade secret.  The SAC contains all the necessary factual allegations to survive the Insurance Agent Defendants' Rule 12(b)(6) motion.

### C.    Palming Off Claim

The eighth cause of action accuses all Defendants of "palming off" the VEBS Program as their own.  Palming off is a form of unfair competition.  It occurs when a defendant deceives the public as to the origin of an imitated good or service.  *Cytanovich Reading Ctr. v. Reading Game*, 208 Cal. Rptr. 412, 417 (Ct. App. 1984).  At ¶ 132, the SAC alleges:

> Subsequent to the Termination, Defendants scheduled retirement seminars with federal agencies by holding themselves out as VEBS.  At the workshops the AGENTS also represented themselves to the federal employees as being affiliated or associated with VEBS.  Defendants represented to the agencies that VEBS had changed its name to that of a VEBS competitor, and later to an entity controlled by RODMAN.  Defendants therefore simulated and imitated Plaintiffs.

ICA Defendants argue the SAC falls short of identifying which individuals misled the public about what products.

The Court, however, finds that the SAC provides a sufficient factual basis to support the alleged cause of action.  Fed. R. Civ. P. 8 (pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief").  The SAC gives fair notice of the facts underlying the palming off claim.

### D.    Breach of Contract Claims

The Insurance Agent Defendants do not attack the breach of contract directly, instead, they contend that the breach of contract claim fails based upon their assumption that it prevailed in its argument that they had a valid license to use the Confidential

Information under the terms of the Confidentiality Agreement.  Because the Court has overruled their objection to the copyright infringement claim, this argument fails.

**III.    Defendants Beth and Larry Chalmers**

On a housekeeping note, the Court lifts the stay that had been entered as to claims against Defendants Beth and Larry Chalmers.  [Doc. No. 71]  The Chalmers had benefitted from the automatic stay occasioned by their Chapter 7 bankruptcy filing; however, the Bankruptcy Court lifted the stay as to this lawsuit.  SAC Ex. A.

The Court finds that the SAC alleges sufficient facts that Beth Chalmers is the alter ego of Premier Financial Solutions, and denies her motion to dismiss.  SAC ¶ 26.

<u>**Conclusion**</u>

The Court denies Defendants' motions to dismiss.  [# 87, 90, 91, 93, & 98]

The Court lifts the stay as to Defendants Larry and Beth Chalmers.  [# 71]

**IT IS SO ORDERED**.

DATED:  June 22, 2012

Hon. Anthony J. Battaglia
U.S. District Judge

23